[This opinion has been published in *Ohio Official Reports* at 85 Ohio St.3d 548.]

THE STATE OF OHIO, APPELLEE, *v.* CHINN, APPELLANT.

[Cite as *State v. Chinn*, 1999-Ohio-288.]

*Criminal law—Aggravated murder—Death penalty upheld, when.*

(No. 97-2020—Submitted February 23, 1999—Decided June 2, 1999.)

APPEAL from the Court of Appeals for Montgomery County, No. 16206.

————————————

{¶ 1} On the evening of January 30, 1989, Davel "Tony" Chinn, appellant, completed a midterm examination at Cambridge Technical Institute in Dayton. Later that night, fifteen-year-old Marvin Washington saw appellant near Courthouse Square in downtown Dayton. Washington, who had known appellant for approximately one year, knew him only by the name of "Tony." Washington and appellant spent part of the night drinking beer and loitering around the downtown area. At some point, appellant showed Washington a .22 caliber nickel-plated revolver and suggested that they look for someone to rob. At approximately 11:00 p.m., Washington went into an adult bookstore on South Ludlow Street and was ejected from the store because of his age. Thereafter, Washington and appellant loitered in the area of South Ludlow Street looking for someone to rob.

{¶ 2} Meanwhile, Gary Welborn and Brian Jones had pulled their cars into a parking lot at the corner of South Ludlow Street and Court Street and had parked side-by-side in opposite directions to converse with each other through their driver's side windows. Appellant and Washington spotted the two men and decided to rob them.

{¶ 3} Washington approached Jones's vehicle from the rear, and appellant approached Welborn's car from the rear. Appellant pulled out a small silver revolver, pressed it against the side of Welborn's head, and demanded money. Welborn saw Washington's face, but he was unable to see the face of the gunman.

Welborn handed his wallet to Washington, and Jones handed his wallet to the gunman. According to Welborn, "the guy with the gun said we'd better have at least a hundred dollars between us or he'd kill us both." After emptying the victims' wallets of money, the two assailants began discussing which car they wanted to steal. Following a brief discussion, they decided to steal both cars. Washington got into the driver's side of Jones's car and forced Jones into the passenger's seat. Appellant instructed Welborn to remain still. As appellant began walking toward the back of Welborn's vehicle, Welborn seized the opportunity to escape. At trial, Welborn testified, "The guy, he comes around. He starts walking around my car, telling me not to touch my keys. He still has the gun pointed at me. I watch him in my rearview mirror and sideview mirror. As soon as he gets behind my car, I ducked down. I thought he was going to kill me now or later anyway so I ducked down in my car seat, threw it in drive, and took up off [*sic*] Ludlow the wrong way, straight to the police station." Welborn arrived at the station at approximately 11:30 p.m. and reported the incident to police.

{¶ 4} After Welborn had escaped, appellant got into the back seat of Jones's car and held the revolver to Jones's neck while Washington drove the car away from Dayton and toward an area in Jefferson Township. At some point, appellant instructed Washington to turn the vehicle around and to pull over to the side of the road. Washington complied with appellant's instructions. After Washington had stopped the car, he leaned forward in the driver's seat so that appellant could exit the two-door vehicle from the driver's side. According to Washington, appellant got out of the car and walked around to the passenger's side. Appellant then got Jones out of the car and shot him. Appellant and Washington drove away from the scene in Jones's automobile. While fleeing from the scene, appellant told Washington that he shot Jones because Jones could have identified them and because Jones "didn't have enough money." Appellant told Washington that he had shot Jones in the arm.

**{¶ 5}** Stacy Ann Dyer lived at 5500 Germantown Pike in Jefferson Township. Dyer witnessed the shooting but did not see the gunman's face. Dyer testified that on January 30, 1989, at approximately 11:30 p.m., she had just arrived home and was parked in her driveway facing the street. At that time, Dyer saw a black two-door Chevrolet Cavalier pull off to the side of the road on Germantown Pike. Dyer observed a man get out of the driver's side of the vehicle and walk over to the passenger's side. She also saw the silhouette of a person exiting the vehicle from the passenger's side. The two people then walked to the back of the car. At that moment, Dyer heard a gunshot and a scream. The victim ran through Dyer's yard and fell to the ground in her neighbor's yard. Dyer then saw the black car speed away from the scene. Dyer ran inside her house and informed her father and her sister what had happened. Dyer's sister called police, and Dyer and her father went outside to check on the victim. They found the victim, Brian Jones, on his knees with his face to the ground. Dyer asked the victim whether he was injured, but Jones did not respond. When police and paramedics arrived at the scene, Jones was still breathing but was unconscious. He never regained consciousness and was pronounced dead on arrival at the hospital.

**{¶ 6}** Dr. David M. Smith performed the autopsy. Smith found that Jones had died as a result of a massive acute hemorrhage due to a gunshot wound to his arm and chest. Smith found that the projectile had entered through Jones's left arm, had proceeded directly into Jones's chest, and had perforated the main pulmonary artery. Smith recovered the .22 caliber lead projectile from an area near the base of Jones's heart. Carl H. Haemmerle, an expert in firearms, examined the .22 caliber projectile and determined that it had been fired from a revolver. He also examined the sweatshirt that Jones had been wearing at the time of the shooting. Evidence revealed that the muzzle of the weapon had been in direct contact with the garment at the time the shot was fired.

{¶ 7} Following the shooting, Washington and appellant drove in Jones's car to 5213 Lome Avenue in Dayton. There, Washington introduced appellant to Christopher "Bay" Ward.

{¶ 8} Ward testified that, on January 31, 1989, at approximately 12:30 or 1:00 a.m., Washington had pulled up to 5213 Lome Avenue in the black Chevrolet Cavalier and had introduced Ward to a man named "Tony," who was seated in the front passenger's seat. Ward spoke to Washington for approximately thirty to forty-five minutes until Washington and the man he was with drove away. Later that night, Washington returned to Lome Avenue and told Ward that "Tony" had shot someone in Jefferson Township.

{¶ 9} On February 5, 1989, police arrested Washington based on information they had received from Ward. Washington confessed to police and named Tony as the killer. However, Washington was unable to give police the suspect's last name and address. On February 7, Washington helped police prepare a composite sketch of Tony. Later, after police had nearly exhausted all leads in their search for Tony, the composite sketch was released to the news media. On Wednesday, February 22, 1989, a Dayton area newspaper printed the composite sketch along with an article indicating that the suspect's name was Tony.

{¶ 10} Shirley Ann Cox worked as a receptionist in her husband's law office. On Thursday, February 23, two men walked into the office. One of the men identified himself as Tony Chinn and requested to see Cox's husband. Cox informed the man that her husband was not available. That night, while Cox was reading the previous day's newspaper, she saw the composite sketch of the suspected killer. She said to her husband, "My God, I don't believe this." "This Tony Chinn that was in [the office] this morning is in the paper." On Friday, February 24, Cox called police to inform them that she had seen the suspect and that his name was Tony Chinn.

{¶ 11} After speaking to Cox, police obtained a photograph of appellant and placed it in a photo array with the pictures of five other men. On February 24, police showed the photo array to Washington and to Ward. Washington positively identified appellant as the killer. Additionally, Ward identified appellant as the man he had seen in the passenger's seat of the victim's car—the man Washington had referred to as "Tony." That same day, on February 24, police arrested appellant in connection with the murder.

{¶ 12} On February 27, police conducted a lineup. Washington, Ward, Cox, Dyer, and Welborn all viewed the lineup. Dyer and Welborn could not identify appellant. Welborn attempted to make a selection based on the voices of the subjects but chose someone other than appellant. Ward and Cox were able to positively identify appellant. Washington initially indicated that the killer was not in the lineup. However, after leaving the room where the lineup was conducted, Washington summoned Detective David Lantz into an interview room and told him that number seven in the lineup (appellant) was the killer. Washington explained to the detective that he had previously indicated that appellant was not in the lineup out of fear that appellant was able to see him through the screen in the room where the lineup was conducted.

{¶ 13} In March 1989, appellant was indicted by the Montgomery County Grand Jury for the aggravated murder of Jones. Count One of the indictment charged appellant with purposely causing the death of Jones during the commission of an aggravated robbery. Count One of the indictment also carried three death penalty specifications: one alleging that the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense (R.C. 2929.04[A][3]), a second alleging that the offense was committed during the course of aggravated robbery (R.C. 2929.04[A][7]), and a third alleging that the offense was committed during the course of kidnapping (R.C. 2929.04[A][7]). Appellant was also indicted on three counts of aggravated robbery (Counts Two, Four, and

Five), one count of kidnapping (Count Three), and one count of abduction (Count Six). Each count of the indictment also carried a firearm specification. Additionally, Counts Two through Six each carried a specification alleging that appellant had previously been convicted of robbery.

{¶ 14} In August 1989, the matter proceeded to trial by jury on all counts and specifications alleged in the indictment, with the exception of the specifications premised on appellant's prior robbery conviction, which were tried to the court. The defense presented several witnesses in the guilt phase of appellant's trial. Through these witnesses the defense attempted to establish that appellant had gone directly home from school on the evening of January 30, 1989, and that he was at home, where he lived with his mother and his brother, at the time of the crimes in question. Following deliberations, the jury returned verdicts of guilt on all of the matters that were tried to the jury. Appellant presented several witnesses in mitigation and gave an unsworn statement in which he denied any involvement in the crimes. Following the mitigation hearing, the jury returned its verdict recommending that appellant be sentenced to death for the aggravated murder of Jones. The trial court accepted the jury's recommendation and imposed the sentence of death. The trial court also found appellant guilty of the prior conviction specifications that were tried to the court without a jury. For the aggravated robberies of Jones and Welborn (Counts Two, Four, and Five), for the kidnapping of Jones (Count Three), and for the abduction of Welborn (Count Six), the trial court sentenced appellant in accordance with law. The trial court also imposed one additional term of three years of actual incarceration for the firearm specifications in connection with the aggravated robbery counts. Further, the court imposed one additional term of three years of actual incarceration for the firearm specification in connection with the kidnapping count, and one for the firearm specification in connection with the count of abduction.

{¶ 15} On appeal, the court of appeals, in 1991, affirmed the judgment of the trial court in part, reversed it in part, and remanded the cause to the trial court for the limited purpose of resentencing appellant on the jury's recommendation of death for the aggravated murder of Jones. *State v. Chinn* (Dec. 27, 1991), Montgomery App. No. 11835, unreported, 1991 WL 289178. The court of appeals found that the trial judge had committed several errors in the performance of his functions under R.C. 2929.03(D)(3) and 2929.03(F). Specifically, the court of appeals held that "the trial judge in performing his independent review for purposes of sentencing pursuant to R.C. 2929.03(D)(3) erred (1) by failing to state his findings specifically as required by R.C. 2929.03(F), (2) by failing to consider relevant mitigating factors, (3) by failing to merge aggravating circumstances, and (4) by weighing both culpability factors of R.C. 2929.04(A)(7), 'principal offender' and 'prior calculation and design' * * *." *Id*. at 2. Therefore, the court of appeals vacated appellant's death sentence and remanded the cause to the trial court "for its reconsideration and proper imposition of sentence, which may include a sentence of death or sentences of life imprisonment with parole eligibility as provided by statute." *Id*. Additionally, the court of appeals found that the trial court had erred when it "imposed more than one sentence of actual incarceration for multiple gun specifications arising from the same transaction * * *." *Id*. Therefore, the court of appeals vacated two of the three terms of actual incarceration that had been imposed by the trial court in connection with the firearm specifications. However, the court of appeals affirmed the judgment of the trial court on all other issues raised on appeal.

{¶ 16} On remand from the court of appeals' 1991 decision, defense counsel, in January 1993, filed in the trial court a motion for imposition of a life sentence, a motion to present additional mitigation evidence, and a motion requesting that appellant be present at any resentencing hearing. In August 1994, defense counsel filed a proffer of evidence and a request to submit certain

documents under seal. On December 6, 1994, the trial court denied the motions for imposition of a life sentence, for an additional mitigation hearing, and for appellant to be present at resentencing. That same day, the trial court filed an opinion and entry resentencing appellant to death.

{¶ 17} On appeal from the trial court's resentencing decision, the court of appeals, in 1996, vacated appellant's death sentence, finding that the trial court had denied appellant the right to be present at resentencing. *State v. Chinn* (June 21, 1996), Montgomery App. No. 15009, unreported, 1996 WL 338678. Therefore, the court of appeals again remanded the cause to the trial court for resentencing, *i.e.*, "for imposition of sentence in Chinn's presence." *Id*. at 16-17.

{¶ 18} On remand from the court of appeals' 1996 decision, the trial court, in September 1996, once again imposed the sentence of death. On appeal, the court of appeals, in August 1997, affirmed the judgment of the trial court and upheld appellant's death sentence. *State v. Chinn* (Aug. 15, 1997), Montgomery App. No. 16206, unreported, 1997 WL 464736.

{¶ 19} The cause is now before us upon an appeal as of right.

––––––––––––––––––

*Mathias H. Heck, Jr.*, Montgomery County Prosecuting Attorney, and *Carley J. Ingram*, Assistant Prosecuting Attorney, for appellee.

*David H. Bodiker*, Ohio Public Defender, *Stephen A. Ferrell* and *Joseph E. Wilhelm*, Assistant Public Defenders, for appellant.

––––––––––––––––––

**DOUGLAS, J.**

{¶ 20} Appellant presents twenty-five propositions of law for our consideration. (See Appendix, *infra*.) We have considered each of appellant's propositions of law and have reviewed the death penalty for appropriateness and proportionality. Upon review, and for the reasons that follow, we uphold appellant's convictions and sentences, including the sentence of death.

I

{¶ 21} We have held, time and again, that this court is not required to address and discuss, in opinion form, each and every proposition of law raised by the parties in a death penalty appeal. We continue to adhere to that position today. We have carefully considered all of the propositions of law and allegations of error and have thoroughly reviewed the record in its entirety. Many of the issues raised by appellant have been addressed and rejected by this court under analogous circumstances in a number of our prior cases. Therefore, these issues require little, if any, discussion. Additionally, many of appellant's arguments have been waived. Upon a careful review of the record and the governing law, we fail to detect any errors requiring reversal of appellant's convictions and death sentence. We have found nothing in the record or in the arguments advanced by appellant that would, in any way, undermine our confidence in the outcome of appellant's trial. Accordingly, we address and discuss, in detail, only those issues that merit detailed analysis.

II

Proposition of Law No. I

{¶ 22} Appellant contends that the trial court's instructions to the jury in the penalty phase failed to adequately define aggravating circumstances and mitigating factors and gave the jury no guidance on what to weigh for purposes of reaching a sentencing recommendation. However, appellant failed to object at trial to the instructions he now claims were erroneous and, thus, he has waived all but plain error with respect to these matters. We find no plain error here.

{¶ 23} Appellant was charged with and found guilty of committing one R.C. 2929.04(A)(3) and two 2929.04(A)(7) specifications of aggravating circumstances in connection with the aggravated (felony) murder of Jones. The R.C. 2929.04(A)(3) specification alleged that the aggravated murder was committed for the purpose of escaping detection, apprehension, trial, or punishment

for the commission of another offense committed by the offender. One R.C. 2929.04(A)(7) specification alleged that the aggravated murder was committed during the course of an aggravated robbery and that appellant was either the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design. The other R.C. 2929.04(A)(7) specification alleged that the aggravated murder was committed during the course of a kidnapping and that appellant was either the principal offender in the murder or, if not, committed the murder with prior calculation and design.

{¶ 24} In the penalty phase, the trial court gave the following instruction to the jury:

"Members of the Jury, you've heard the evidence and the arguments of counsel, and you will now decide whether you'll recommend to the Court that the sentence of death shall be imposed upon the Defendant and, if not, whether you recommend [one of two life sentencing options]. You will consider all the evidence, the arguments, the statement of the Defendant, and all other information and reports which are relevant to the nature and circumstances of the aggravating circumstances. Among the circumstances that are listed in the statute and there are eight references have been made and you have found these aggravating circumstances. One is that if the offense was committed for the purpose of escaping detection, apprehension, trial, or punishment for another offense committed by the offender. Another of those aggravating circumstances is if the offense was committed while the offender was committing, or attempting to commit, or fleeing immediately after committing or attempting to commit kidnapping. Then they list a number of others: Kidnapping and rape; aggravated arson; aggravated robbery; or aggravated burglary; and either the offender was the principal offender in the commission of the aggravated murder or, if not the principal offender, committed the aggravated murder with prior calculation and design. You will consider all the

evidence, the arguments, the statement of the Defendant, and all of the information and reports that are relevant to the nature and circumstances of the mitigating facts, and the mitigating facts include but are not limited to the nature and circumstances of the offense, and the history, character, and background of the Defendant; and you may consider, I guess, should consider any facts that are relevant to the issue of whether the Defendant should be sentenced to death. The prosecutor has the burden to prove beyond a reasonable doubt that the aggravating circumstances of which the Defendant was found guilty outweighs [*sic*] the facts in mitigation of imposing the death sentence. * * * You shall recommend the sentence of death if you unanimously, that's all twelve, find by proof beyond a reasonable doubt that the aggravating circumstances outweigh the mitigating facts. If you do not so, fine, you shall unanimously, all twelve, recommend [one of two life sentencing options]."

{¶ 25} While the trial court's instructions to the jury appear to be somewhat confusing, the instructions clearly do not rise to the level of plain error. The trial court correctly instructed the jury on the R.C. 2929.04(A)(3) aggravating circumstance the jury had previously found appellant guilty of committing. However, in referring to the R.C. 2929.04(A)(7) aggravating circumstances premised on the kidnapping and aggravated robbery, the trial court referred to a number of felonies listed in R.C. 2929.04(A)(7) for which appellant was neither charged nor convicted, *i.e.*, rape, aggravated arson, and aggravated burglary. Nevertheless, it is a stretch to argue as appellant does now that the trial court "appear[ed] to be telling the jury that there [were] *eight* aggravating circumstances" in this case. (Emphasis *sic*.) A review of the record clearly reveals that the jury was made aware throughout the trial that there were *three*—not eight— specifications of aggravating circumstances at issue in this case. Moreover, there was never any evidence offered of arson, rape, or aggravated burglary that may have led the jury to believe that appellant was guilty of committing an R.C.

2929.04(A)(7) aggravating circumstance premised upon those particular felonies. The trial court's references to arson, rape, and aggravated burglary should not have been made, but the references do not amount to plain error.

{¶ 26} Additionally, during its deliberations in the penalty phase, the jury sent a note to the trial judge requesting a clarification of the aggravating circumstances and mitigating factors. The note stated, "We would like a summary of the *elements* that make up the mitigating and aggravating circumstances/factors. For example, character of [defendant], testimony of [defendant], etc." (Emphasis *sic*.) The trial court responded, "The aggravating circumstances are those that you have found in previous specifications and the mitigating factors are those which are relevant to the issue of whether the defendant should be sentenced to death, and they include, but are not limited to, the nature and circumstances of the offense and the history, character and background of the defendant." We find that the trial court's response to the jury's question clarified that there were only three aggravating circumstances the jury was to consider and weigh in the penalty phase, *i.e.*, the three specifications of aggravating circumstances the jury had previously found appellant guilty of committing.

{¶ 27} Nevertheless, appellant claims that the trial court's response to the jury's question merely "added to the confusion." Specifically, appellant argues that "[b]y telling the jury that the aggravating circumstances were the same as the specifications, the court instructed the jury to weigh a nonstatutory aggravating circumstance, the firearm specification, which was attached to each substantive count in the indictment." However, the record does not support appellant's arguments in this regard. The record clearly demonstrates that the trial court's statement that "[t]he aggravating circumstances are those that you have found in previous specifications" referred only to the death penalty specifications for which the jury had previously found appellant guilty of committing. The firearm specifications were submitted to the jury only in the guilt phase and were not even

identified as "specifications" on the verdict forms that were returned by the jury at the conclusion of the guilt phase. The only specifications that were identified as such on the verdict forms in the guilt phase of appellant's trial were the three death penalty specifications that had been submitted to the jury in connection with Count One of the indictment, *i.e.*, the R.C. 2929.04(A)(3) specification and the two R.C. 2929.04(A)(7) specifications. For these reasons, it is clear that the trial court's response to the jury's question in the penalty phase did not invite the jury to consider the firearm specifications as nonstatutory aggravating circumstances.

{¶ 28} Appellant also contends that the trial court's response to the jury's question concerning aggravating circumstances and mitigating factors led the jury to consider and to weigh the nature and circumstances of the offense as nonstatutory aggravating factors. We disagree. The trial court's response to the jury's question listed the nature and circumstances of the offense among the *mitigating* factors to be considered by the jury.

{¶ 29} Next, appellant contends that the R.C. 2929.04(A)(3) and (A)(7) specifications of aggravating circumstances should have been merged into a single aggravating circumstance prior to the penalty phase, since, according to appellant, the specifications were duplicative. The court of appeals, in 1991, determined that the specifications should have been merged, stating, "In our view, all three specifications clearly arose from the same act or indivisible course of conduct. Jones was robbed in downtown Dayton and then driven to a remote area of Jefferson Township so that he could be killed to conceal the robbery. The kidnapping (driving Jones to a rural area) occurred only so as to effectuate the concealment of the robbery, and, as explained above, the concealment of the robbery must merge with the robbery itself as a matter of law. Furthermore, the kidnapping was merely incidental to the robbery, and thus must be merged for this reason as well." *Chinn*, Montgomery App. No. 11835, unreported, at 50-51. Therefore, the court of appeals concluded that the trial court had erred by "failing

13

to merge the three aggravating factors into one, *viz.*, that Chinn was the principal offender in the aggravated murder committed while he was fleeing immediately after committing an aggravated robbery, per R.C. 2929.04(A)(7)." *Id*. at 53-54. However, the court of appeals also determined that the trial court's failure to merge the duplicative specifications in its instructions to the jury did not amount to plain error. *Id*. at fn. 2. We agree. On remand from the court of appeals' 1991 decision, the trial court merged the allegedly duplicative specifications into one R.C. 2929.04(A)(7) specification and imposed the death sentence upon a finding that the single aggravating circumstance outweighed the evidence in mitigation beyond a reasonable doubt. The court of appeals, in 1997, also considered a single R.C. 2929.04(A)(7) specification for purposes of its independent sentencing review and concluded that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt. *Chinn*, Montgomery App. No. 16206, unreported. We believe that this conclusion was virtually inescapable. Indeed, given the dearth of mitigating evidence in this case, it is clear to us that the outcome of appellant's trial would not have been any different had the three specifications of aggravating circumstances been merged into one prior to the penalty phase.

{¶ 30} Additionally, this court can cure any error related to duplicative aggravating circumstances by merging the three specifications of aggravating circumstances as part of our independent sentencing review. See, generally, *State v. Palmer* (1997), 80 Ohio St.3d 543, 575, 687 N.E.2d 685, 711. For purposes of our independent review, we too have considered only one aggravating circumstance, *i.e.*, the single R.C. 2929.04(A)(7) aggravating circumstance predicated on aggravated robbery. Our independent review has produced no different outcome despite the merger of the allegedly duplicative specifications. See discussion in Part XXIV, *infra*.

{¶ 31} Appellant also claims the trial court erred by instructing the jury in the penalty phase on both the principal offender *and* the prior calculation and design

aspects of R.C. 2929.04(A)(7). Appellant asserts that the jury should have been instructed that it could not consider whether appellant committed the murder with prior calculation and design if appellant was found to be the principal offender in the aggravated murder. However, we have held that "a trial court may instruct the jury on prior calculation and design and principal offender status disjunctively in the same specification." *State v. Burke* (1995), 73 Ohio St.3d 399, 405, 653 N.E.2d 242, 248. That is precisely what occurred in the case at bar.

{¶ 32} The court of appeals vacated the appellant's death sentence in 1991 because the trial court, in its original sentencing opinion, had determined that appellant was the principal offender *and* that he had committed the offense with prior calculation and design. *Chinn*, Montgomery App. No. 11835, unreported, at 52-57. Appellant claims that "[b]ecause the trial court committed precisely this error, it is highly likely that the jury did also." However, appellant's argument is purely speculative and is not supported by the record. Moreover, contrary to appellant's arguments, it is clear to us that the jury unanimously determined that appellant was the principal offender in the aggravated murder of Jones. At trial, the state's evidence portrayed appellant as the principal offender. Conversely, appellant offered a defense of alibi. Thus, the main issue for the jury was one of identity, *i.e.*, either appellant shot and killed the victim or appellant was somewhere else at the time of the killing. There was no evidence at trial that anyone other than appellant was the actual killer if, in fact, appellant was the man who was with Marvin Washington on the night in question. Therefore, the evidence suggested that appellant was either the principal offender in the aggravated murder or, if not the principal offender, that he committed no offense at all. The jury obviously accepted the state's theory of the case and, in so doing, found appellant to be the principal offender in the aggravated murder. Under these circumstances and because the jury was instructed on the principal offender and the prior calculation and design aspects of R.C. 2929.04(A)(7) in the disjunctive, there is no danger that

the jury actually considered the prior calculation and design alternative of the R.C. 2929.04(A)(7) death penalty specifications during its sentencing deliberations.

{¶ 33} Accordingly, for the foregoing reasons, appellant's first proposition of law is not well taken.

### III

### Proposition of Law No. II

{¶ 34} The matter concerning the appropriateness of appellant's death sentence is addressed in our discussion in Part XXIV, *infra*.

### IV

### Proposition of Law No. III

{¶ 35} The matter concerning the proportionality of appellant's death sentence is addressed in our discussion in Part XXIV, *infra*.

### V

### Proposition of Law No. IV

{¶ 36} Appellant raises claims of prosecutorial misconduct, but many of appellant's arguments have been waived by his failure to object at trial. We have carefully reviewed the record in its entirety and have considered all of appellant's claims of prosecutorial misconduct. We have found no instance of prosecutorial misconduct that would rise to the level of reversible error. The instances of alleged misconduct, taken singly or together, did not substantially prejudice appellant or deny him a fair trial and a fair and reliable sentencing determination.

VI

Proposition of Law No. V

{¶ 37} Appellant contends that the trial court erred by failing to define the term "principal offender" as part of the instructions to the jury in the guilt phase. Appellant claims that the failure to define that term was tantamount to a failure to instruct on an essential element of the R.C. 2929.04(A)(7) specifications. However, appellant not only failed to object to the lack of instruction, but he also failed to raise the issue on appeal to the court of appeals. Therefore, appellant has waived all but plain error with respect to this matter.

{¶ 38} The term "principal offender," as it is used in R.C. 2929.04(A)(7), means "the actual killer." *State v. Penix* (1987), 32 Ohio St.3d 369, 371, 513 N.E.2d 744, 746. The jury should have been so instructed. However, the absence of the instruction does not amount to plain error. Here, the state presented strong evidence identifying appellant as the killer. Conversely, the defense claimed that appellant was at home at the time of the killing. There was no evidence to suggest that appellant, if he was present at the time of the aggravated murder, was anything but the actual killer. Therefore, in order to find appellant guilty of the R.C. 2929.04(A)(7) specifications, the jury would have had to conclude that appellant was the actual killer. Under these circumstances, the trial court's failure to *sua sponte* instruct the jury that "principal offender" means the actual killer was not outcome-determinative. See *State v. Stojetz* (1999), 84 Ohio St.3d 452, 461, 705 N.E.2d 329, 339.

VII

Proposition of Law No. VI

{¶ 39} In his sixth proposition of law, appellant contends that the trial court erred by allowing Shirley Ann Cox to testify at trial concerning appellant's visit to her husband's law office. Appellant claims that Cox's testimony was irrelevant and was unfairly prejudicial. We agree with appellant's assertions that the trial court

should not have permitted Cox to testify that her encounter with appellant occurred in a law office. However, we also agree with the court of appeals' finding in 1991 that although the evidence was "unfairly prejudicial, that unfairness does not clearly jeopardize the fundamental fairness of the proceeding or the reliability of the verdict." *Chinn*, Montgomery App. No. 11835, unreported, at 38. Appellant protests that the court of appeals' holding on this issue "fails to take into account the fundamental weakness of the State's case against Chinn." However, appellant's arguments plainly mischaracterize the strength of the evidence against him which, in our view, cannot seriously be labeled as "weak." Rather, the state's case against appellant was substantial and compelling.

{¶ 40} Appellant also suggests that Cox's testimony concerning her identification of appellant as the person depicted in the composite drawing should have been excluded because Cox did not witness the crimes and her testimony may have misled or confused the jury. However, the jury was not misled or confused by Cox's testimony. The jury was well aware that Cox did not witness the killing. Her testimony was relevant to the fact that she had seen a man who identified himself as Tony Chinn and that she subsequently saw a composite sketch of the suspected killer and recognized the resemblance between the composite and Chinn. While this testimony was largely irrelevant to the question of appellant's guilt, the testimony was relevant to inform the jury of the events that led to appellant's apprehension and arrest. Cox's testimony also corroborated Washington's testimony that appellant (whose real name is Davel Von Tress Chinn) went by the name of Tony Chinn. The evidence was not confusing or misleading in any way.

{¶ 41} We conclude that while it might have been better for the trial court to have excluded Cox's testimony altogether, or at least any reference to the fact that she had seen appellant in a law office, the trial court's decision to allow Cox's testimony was harmless beyond a reasonable doubt. Cox's testimony was not a major factor in this case. Indeed, her testimony comprises less than eight full pages

of the printed transcript. The state's case against appellant hinged on the testimony of Marvin Washington. If the jury accepted Washington's testimony, the jury was certain to convict appellant, but if the jury did not believe Washington, it was certain to acquit appellant of all charges. Had the jury disregarded Washington's account of the crimes, Cox's testimony would have made no difference. However, the jury believed Washington and, therefore, the verdicts of guilt were inevitable. Cox's testimony had little or no impact on the outcome.

{¶ 42} In this proposition, appellant also contends that the trial court erred by permitting Detective David Lantz to testify at trial concerning Cox's identification of appellant at the February 27, 1989 lineup. At trial, the following exchange took place during the state's direct examination of Detective Lantz:

"Q. Was Mrs. Cox able to make an —

"MR. MONTA [defense counsel]: Objection, your Honor. We need to approach on this.

"MR. MONTA: Your Honor, the prosecution had Mrs. Cox on the stand. They also had these documents which would indicate whether a person is seen in a line-up or not. They did not choose to go into that with Mrs. Cox, and as a result of no questioning on this subject with her, this * * * testimony is going to be hearsay.

"THE COURT: Well, defense has also known that she had made the identification, which she could have been asked about. The fact that she was not asked by either party does not in any way prevent this witness to testify as to what he saw. I'll overrule the objection.

"Q. Was Mrs. Cox able to [make an] identification at the line-up?

"A. Yes, she was.

"Q. Who[m] did she indicate?

"A. Again, number seven, the Defendant Davel Chinn."

**{¶ 43}** Appellant contends that Lantz's testimony constituted impermissible hearsay and resulted in substantial prejudice. We disagree. Lantz's statements concerning Cox's identification of appellant were not hearsay. Evid.R. 801 provides:

"(D) A statement is not hearsay if:

"(1) The declarant testifies at the trial or hearing and is subject to cross-examination concerning the statement, and the statement is * * * (c) one of identification of a person soon after perceiving him, if the circumstances demonstrate the reliability of the prior identification."

**{¶ 44}** As the court of appeals ably recognized, "[b]ecause Cox was 'subject to cross-examination' on the lineup, regardless of whether she was actually ever *subjected* to such examination, Det. Lantz's testimony was not hearsay." (Emphasis *sic*.) *Chinn*, Montgomery App. No. 11835, unreported, at 39. We agree that Lantz's testimony did not constitute hearsay under Evid.R. 801(D)(1)(c). Moreover, and in any event, we fail to see how that testimony was prejudicial to appellant.

**{¶ 45}** Appellant also argues that the trial court erred by permitting Detective Lantz to testify at trial, over defense objection, concerning Washington's explanation for not immediately identifying appellant at the lineup. Appellant contends that Lantz's testimony was hearsay. However, even if the testimony at issue was hearsay, and we do not believe that it was (see Evid.R. 801[D][1][b] and *Chinn*, Montgomery App. No. 11835, unreported, at 75-76), prejudice is lacking in that Washington had earlier testified as to the statement he made to Lantz.

**{¶ 46}** Additionally, appellant challenges Christopher Ward's testimony concerning certain statements that Washington had made in the early morning hours of January 31, 1989. Specifically, appellant claims that Ward's testimony constituted inadmissible hearsay. Appellant failed to object to the testimony at trial and, thus, has waived all but plain error with respect to these matters. We agree

with appellant that the testimony of Ward at issue was hearsay. However, we conclude that appellant has failed to demonstrate plain error, *i.e.*, that but for the alleged errors, the outcome of his trial clearly would have been otherwise. Therefore, we reject appellant's arguments concerning Ward's testimony.

{¶ 47} Accordingly, for the foregoing reasons, appellant's sixth proposition of law is not persuasive.

VIII

Proposition of Law No. VII

{¶ 48} The court of appeals, in 1991, vacated appellant's original death sentence on grounds that the trial judge, after receiving the jury's recommendation, had committed errors in his original independent evaluation under R.C. 2929.03(D)(3) and in his original sentencing opinion. However, the court of appeals also determined that the jury's recommendation had not been tainted by error. Therefore, since the errors had been committed by the trial court and not by the jury, the court of appeals determined that the rule of *Penix*, 32 Ohio St.3d 369, 513 N.E.2d 744, syllabus, did not prohibit the trial court from reimposing the death sentence on remand. *Chinn*, Montgomery App. No. 11835, unreported, at 55-57. In this regard, the court of appeals found the situation analogous to one in which a three-judge panel commits error in sentencing—a situation that would not preclude reimposition of a death sentence. *Id.*, citing *State v. Davis* (1988), 38 Ohio St.3d 361, 528 N.E.2d 925, syllabus ("When a reviewing court vacates the death sentence of a defendant imposed by a three-judge panel due to error occurring at the penalty phase, not otherwise covered by [former] R.C. 2929.06, and the reviewing court does not find the evidence to be legally insufficient to justify imposition of the death sentence, such reviewing court may remand the action to that trial court for a resentencing hearing at which the state may seek whatever punishment is lawful, including, but not limited to, the death sentence.").

{¶ 49} On remand from the court of appeals' 1991 decision vacating appellant's original death sentence, appellant filed motions in the trial court requesting, among other things, a hearing to present additional mitigation evidence and requesting to be present at resentencing. The trial court denied these motions and, in 1994, once again imposed the death sentence. This time, the trial court complied with all statutory mandates, including those required under R.C. 2929.03(F), but did not impose the death sentence in appellant's presence.

{¶ 50} Thereafter, on appeal from the trial court's resentencing decision, the court of appeals, in 1996, held that it was error for the trial court to have denied appellant the right to be present at resentencing. *Chinn*, Montgomery App. No. 15009, unreported. However, the court of appeals found that the trial court had not erred by refusing to conduct an evidentiary hearing on remand. *Id*. at 2-6. The court of appeals stated, "When we remanded Chinn's case, we did not expect the trial court to conduct a resentencing hearing, and we find no compelling reason why Chinn should have been afforded a second opportunity to present mitigating evidence prior to sentencing. Chinn was given a full opportunity to present such evidence at the initial sentencing hearing. The error for which we remanded the matter occurred after the mitigating evidence had been presented and after the jury had made its recommendation based upon that evidence. On remand, the trial court was required to proceed from the point at which the error occurred. *State ex rel. Stevenson v. Murray* (1982), 69 Ohio St.2d 112, 113 [23 O.O.3d 160, 160-161, 431 N.E.2d 324, 325]. In Chinn's case, the error occurred after the sentencing hearing." *Id*. at 5. Therefore, the court of appeals remanded the matter to the trial court "for imposition of sentence in Chinn's presence" and reiterated that the sentencing options included the possibility of a death sentence. *Id*. at 16-17.

{¶ 51} On remand from the court of appeals' 1996 decision, the trial court, in appellant's presence, once again imposed the death sentence. In its sentencing entry, the trial court stated, "With regard to Count 1, it is the conclusion of this

Court that the verdict of the jury recommending death be accepted." On appeal, the court of appeals, in 1997, affirmed. *Chinn*, Montgomery App. No. 16206, unreported.

{¶ 52} In his seventh proposition of law, appellant contends that he was ineligible for the death penalty on remand from the court of appeals' 1991 decision vacating his original death sentence. Appellant claims that "[w]hen the court of appeals vacated Chinn's death sentence it also vacated the trial jury's sentencing recommendation." We disagree. In neither case where the court of appeals vacated appellant's death sentence did the appellate court purport to vacate the jury's verdict recommending imposition of the death penalty. Nor was the court of appeals required to vacate the jury's recommendation in this case. The appellate court specifically determined, and we agree, that the recommendation of the jury was untainted by error. Moreover, contrary to appellant's contentions, *Penix* does not preclude the trial court from imposing the death sentence on remand. The reason, of course, is that the errors identified and relied upon by the court of appeals in vacating appellant's original death sentence in 1991 related to the trial judge's independent evaluation of sentence. These errors were committed *after* the jury had returned its verdict in the penalty phase. Under these circumstances, the court of appeals correctly determined that *Penix* does not prohibit the trial judge, on remand, from accepting the jury's 1989 sentencing recommendation. Rather, as the court of appeals recognized, the trial court was required to proceed on remand from the point at which the errors had occurred, *i.e.*, after the jury had returned its recommendation of death.

{¶ 53} In this proposition, appellant also argues that he had "an absolute right to present any new mitigating evidence at his resentencing hearing in 1994." In support of this proposition, appellant relies on several United States Supreme Court opinions requiring that the sentencer not be precluded from considering relevant mitigating evidence in a capital case. See, *e.g.*, *Lockett v. Ohio* (1978),

438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973; *Skipper v. South Carolina* (1986), 476 U.S. 1, 106 S.Ct. 1669, 90 L.Ed.2d 1; and *Hitchcock v. Dugger* (1987), 481 U.S. 393, 107 S.Ct. 1821, 95 L.Ed.2d 347. However, each of those cases involved a situation where the capital sentencer was prohibited, in some form or another, from considering relevant mitigating evidence at trial. In the case at bar, no relevant mitigating evidence was ever excluded from consideration during the penalty phase of appellant's 1989 trial. Therefore, the case at bar is clearly distinguishable from the United States Supreme Court's pronouncements in *Lockett*, *Skipper*, and *Hitchcock*. Accordingly, as was the case in *State v. Davis* (1992), 63 Ohio St.3d 44, 46, 584 N.E.2d 1192, 1194-1195, we find *Lockett*, *Skipper*, and *Hitchcock* to be inapplicable here. It is of no consequence that the additional mitigating evidence in *Davis* involved *post-trial* accomplishments, whereas appellant's additional mitigation evidence involves matters appellant claims he could have presented but did not present during the mitigation phase of his 1989 trial. In this case, as in *Davis*, the errors requiring resentencing occurred after the close of the mitigation phase of the trial. Under these circumstances, the trial court is to proceed on remand from the point at which the error occurred. Appellant's arguments to the contrary are not well taken. In addressing this issue, the appellate court stated, "In sum, Chinn was not entitled to an opportunity to improve or expand his evidence in mitigation simply because we [the court of appeals] required the trial court to reweigh the aggravating circumstance and mitigating factors." *Chinn*, Montgomery App. No. 15009, unreported, at 6. We agree with the court of appeals' assessment of this issue.

{¶ 54} Additionally, appellant takes issue with the fact that in its 1996 sentencing entry the trial court simply stated, "it is the conclusion of this Court that the verdict of the jury recommending death be accepted." Appellant contends that the trial court failed to independently weigh the aggravating circumstance and the mitigating factors in reimposing the death sentence in 1996 and failed to comply

with the requirements for the issuance of a sentencing opinion under R.C. 2929.03(F). However, the trial court's 1994 sentencing opinion fully complied with the requirements of R.C. 2929.03(F). The mere fact that the trial court did not specifically incorporate its 1994 sentencing opinion into its 1996 sentencing entry does not rise to the level of reversible error. Furthermore, appellant failed to raise this issue during his final appeal to the court of appeals and, therefore, appellant's arguments have been waived.

{¶ 55} Accordingly, for all of the foregoing reasons, we reject appellant's seventh proposition of law.

IX

Proposition of Law No. VIII

{¶ 56} In his eighth proposition of law, appellant contends that the evidence is insufficient to establish his identity as the perpetrator of the aggravated murder. He also claims that the evidence is insufficient to show that he specifically intended to cause the death of his victim. Appellant's contentions are not well taken.

{¶ 57} In this proposition, appellant essentially asks us to evaluate the credibility of witnesses and to resolve all evidentiary conflicts in his favor. However, in reviewing the sufficiency of evidence, "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." (Emphasis *sic*.) *Jackson v. Virginia* (1979), 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560, 573.

{¶ 58} Appellant argues that Marvin Washington's testimony is inherently unreliable and wholly unbelievable. We emphatically disagree. Washington's trial testimony was cogent and intelligible, and we are completely satisfied that his testimony identifying appellant as the killer, if accepted, sufficiently and overwhelmingly establishes appellant's guilt beyond a reasonable doubt. Appellant points out that Washington was a participant in the crimes. This is undoubtedly

true.  Washington was an eyewitness to the killing and he participated in and witnessed all aspects of the crimes.  As a participant, he was in a much better position to identify the killer than anyone else who testified at trial.  Washington had nothing to gain from testifying against appellant.  Prior to testifying, Washington was charged with and was sentenced in juvenile court for his participation in these crimes.  Washington's testimony at appellant's trial was not part of any plea agreement.  Additionally, as a juvenile offender, Washington was not eligible for the death penalty as an accomplice to the crimes.  Therefore, in addition to having been in the best position to identify the killer, Washington simply had no reason to lie.

{¶ 59} At trial, Washington testified that he and appellant robbed two men in Dayton and that they kidnapped Jones in Jones's car.  Welborn corroborated Washington's description of the robbery, the abduction, the kidnapping, and the car theft.  Welborn testified that Washington was one of the perpetrators of the robbery.  Welborn never saw the face of the second robber, but Washington's testimony clearly identified appellant as the other participant in the crimes.  Washington testified that he and appellant drove Jones to an area of Jefferson Township.  According to Washington, appellant then got out of the car and shot Jones.  Stacy Dyer witnessed the shooting.  Although Dyer did not get a look at the shooter and therefore could not identify him, Dyer's testimony corroborated, in large part, Washington's description of the events that occurred in Jefferson Township on the night of January 30, 1989.  Washington also testified that he and appellant then drove in the victim's car to Lome Avenue in Dayton and that they spoke to Christopher Ward.  Ward testified that he saw Washington and appellant in Jones's car in the early morning hours of January 31, 1989.  Therefore, Ward's testimony not only corroborated Washington's testimony but also served to severely undermine appellant's alibi defense.

{¶ 60} Appellant points out that Washington failed to immediately identify him at a lineup conducted on February 27, 1989. However, the reason that Washington had failed to do so was adequately explained at trial. Additionally, there is no dispute that immediately after the lineup Washington summoned Detective Lantz into an interview room and positively identified appellant as the perpetrator of the aggravated murder.

{¶ 61} Appellant also points out that several witnesses at trial indicated that the man who was with Washington on the night of the murder was taller than appellant. However, this discrepancy in the evidence does not severely undermine either Washington's testimony identifying appellant as the killer or Ward's testimony that he saw appellant and Washington in the victim's car shortly after the murder.

{¶ 62} The fact remains that Washington was the state's eyewitness to the crimes and that he positively identified appellant as the killer. The jury accepted Washington's testimony. Upon a review of the entire record, it is clear to us that Washington's testimony was neither inherently unreliable nor inherently unbelievable. Indeed, upon a careful review of the record before us, we find Washington's testimony to be entirely believable. However, we note, in passing, that our view of the credibility of witnesses is not what is important on the question of sufficiency of the evidence. What is important is our finding that the evidence in this case was sufficient to establish appellant's identity as the perpetrator of the aggravated murder.

{¶ 63} Appellant also claims that the evidence is insufficient to show that he specifically intended to cause Jones's death, since the fatal shot had been fired into the upper portion of Jones's left arm. However, the evidence at trial established that the muzzle of the revolver was pressed against the victim's sweatshirt at the time the weapon was discharged. The projectile entered through the victim's left arm, entered his chest, perforated the main pulmonary artery, and came to rest near

the base of his heart. We therefore have great difficulty accepting appellant's characterization of the evidence as indicating nothing more than that the victim was "shot in the arm." The shot was fired in a manner that was likely to and did cause the victim's death. Additionally, "[i]t is well-established that 'where an inherently dangerous instrumentality was employed, a homicide occurring during the commission of a felony is a natural and probable consequence presumed to have been intended. Such evidence is sufficient to allow a jury to find a purposeful intent to kill.' " *State v. Esparza* (1988), 39 Ohio St.3d 8, 14, 529 N.E.2d 192, 199, quoting *State v. Jester* (1987), 32 Ohio St.3d 147, 152, 512 N.E.2d 962, 968. The evidence was clearly sufficient to show that appellant specifically intended to cause the death of his victim.

{¶ 64} Upon a careful review of the entire record, we find that the evidence was more than sufficient to establish appellant's identity as the perpetrator of the aggravated murder and to show that he specifically intended to cause the death of his victim. Accordingly, we reject appellant's eighth proposition of law.

X

Proposition of Law No. IX

{¶ 65} The matter raised in appellant's ninth proposition of law has been waived. Moreover, we find no merit to appellant's arguments that R.C. 2929.03(D)(1) somehow renders R.C. 2929.04(A) and (B) unconstitutionally vague. Accordingly, appellant's ninth proposition of law is not well taken.

XI

Proposition of Law No. X

{¶ 66} Appellant contends that he is entitled to a new trial because there is nothing in the record to indicate that appellant and defense counsel were present on two occasions involving communications between the trial court and the jury. However, we are unwilling to presume that appellant and his attorneys were not present during the times in question. Rather, "the record must *affirmatively indicate*

*the absence* of a defendant or his counsel during a particular stage of the trial." (Emphasis added.)  *State v. Clark* (1988), 38 Ohio St.3d 252, 258, 527 N.E.2d 844, 851.  The record does not affirmatively so indicate and, therefore, we reject appellant's tenth proposition of law.

## XII

### Proposition of Law No. XI

{¶ 67} We find no errors in the manner in which the trial court conducted *voir dire*.

## XIII

### Proposition of Law No. XII

{¶ 68} In his twelfth proposition of law, appellant argues that the trial court erred by denying his request for a bill of particulars.  In this proposition, appellant also contends that the prosecution failed to comply with certain discovery rules and thereby deprived him of a fair trial.  For the following reasons, we reject appellant's Proposition of Law No. XII.

{¶ 69} During a hearing on various pretrial motions the trial court denied appellant's motion for a bill of particulars.  The trial court noted that appellant's motion had been untimely filed and determined that, even if the motion was timely, a bill of particulars was not necessary to aid appellant in preparing for trial. Appellant contends that the trial court's denial of his request for a bill of particulars rendered him unable to present an adequate defense.  We disagree with appellant's contentions.

{¶ 70} Assuming, without deciding, that appellant's request was timely, it was clear error for the prosecution to fail to provide a bill of particulars and for the trial court to have denied appellant's motion.  The law is clear:  "In a criminal prosecution the state must, in response to a request for a bill of particulars * * *, supply specific dates and times with regard to an alleged offense where it possesses

such information." *State v. Sellards* (1985), 17 Ohio St.3d 169, 17 OBR 410, 478 N.E.2d 781, syllabus.

{¶ 71} However, appellant correctly notes that the issue raised herein ultimately turns on the question whether appellant's lack of knowledge concerning the specific facts a bill of particulars would have provided him actually prejudiced him in his ability to fairly defend himself. Here, the denial of appellant's request in no way precluded or otherwise hindered him from effectively presenting his defense. A review of the indictment plainly indicates that appellant was being charged with the aggravated (felony) murder of Brian Jones, the kidnapping of Jones, the abduction of Welborn, and three separate aggravated robbery offenses, all of which occurred January 30, 1989. Moreover, the record clearly reveals that defense counsel knew from the information they were able to obtain that the offenses had occurred between the hours of 11:00 p.m. and midnight on January 30, 1989. Therefore, the record simply does not support appellant's claims that he lacked specific information as to the offenses charged. Thus, while the denial of a timely request for a bill of particulars should never occur, it is clear that appellant suffered no prejudice as a consequence of the denial that occurred in this case.

{¶ 72} Appellant also asserts that the trial court erred when it failed to grant discovery in accordance with the Local Rules of the Court of Common Pleas of Montgomery County, General Division. Specifically, the trial court in this case ordered that discovery would proceed pursuant to Crim.R. 16 as opposed to Loc.R. 3.01 and 3.03. While much could be said concerning Crim.R. 16 and the theory of "open file" discovery of the type authorized by local rule (see, *e.g., State v. Lambert* [1994], 69 Ohio St.3d 356, 356-357, 632 N.E.2d 511, 511 [Pfeifer, J., concurring]; see, also, *State ex rel. Steckman v. Jackson* [1994], 70 Ohio St.3d 420, 428-429, 639 N.E.2d 83, 89-90), suffice it to say that our review of the record reveals that appellant suffered no prejudice in connection with the trial court's decision to adhere to Crim.R. 16 exclusively. The record is clear that appellant was in

possession of much of the material that would have been available to him had the local rules been deemed applicable by the trial court. With respect to the materials that appellant allegedly did not have and to which he claimed entitlement under the local rules, appellant has utterly failed to demonstrate that he was prejudiced in any discernible way.

{¶ 73} We also find no reversible error in connection with any of the other matters appellant has raised in this proposition of law. Appellant's argument concerning the alleged *Brady* violation (see *Brady v. Maryland* [1963], 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215) and his argument with respect to the denial of a motion to seal the prosecutor's file for appellate review are not well taken.

XIV

Proposition of Law No. XIII

{¶ 74} At trial, Christopher Ward testified that on January 31, 1989, at approximately 12:30 or 1:00 a.m., Washington had pulled up to 5213 Lome Avenue in the black Chevrolet Cavalier and introduced Ward to "Tony," who was seated in the front passenger's seat. Ward testified that he shook Tony's hand and then spoke to Washington for approximately thirty to forty-five minutes until Washington and Tony drove away. Ward identified appellant as the man that Washington had introduced as Tony. During cross-examination, defense counsel sought to cast doubt on Ward's identification of appellant. During questioning, the following exchange took place:

"Q. Do you remember telling McKeever —

"MR. HECK: I'm going to object now even though he didn't get to finish what he's going to quote.

"THE COURT: Let me see counsel at side Bench.

" * * *

"THE COURT: Let's make a record. First of all, let's have your complete question.

"MR. MONTA: Okay. The question which we would like to ask this witness was if he gave an oral statement to Major McKeever, Major Ronald McKeever, with the Jefferson Township Police on the 5th of February, 1989, and *did he say to Major McKeever he did not pay any attention to the other man in the car whose name was Tony*.

"MR. HECK: I object. If he wants to cross-examine him on an alleged inconsistency in the statements, written statements, that's fine. But, my reading of the written statements there is not that inconsistency. He is trying to cross-examine this witness on either a made-up statement or on something that's in the police report, which they have, and I object.

"THE COURT: First of all, under Rule 16, the police report is not available. Secondly, the copy of the statement given to the Court made by this witness on the 5th of February, and McKeever as the officer signing it, has nothing to do with this question. It does not contain any reference to the question before the Court; therefore, the question has to be solely caused by this police report, and so the Court will sustain the objection.

"MR. MONTA: May I just add, your Honor, the question which would be asked is one in which the defense is attempting to test the credibility of what the witness has said and answer will either be consistent with or impeach that testimony.

"THE COURT: Police reports are inherently inaccurate and that is the very reason why under criminal rule 16 they are not to be made available and not to be used on cross-examination of any witnesses. On that basis, the Court sustains the objection." (Emphasis added.)

{¶ 75} The court of appeals in its 1991 decision in this matter found that the trial court had erred by denying defense counsel the opportunity to cross-examine Ward on the alleged prior inconsistent statement, finding that "[w]hether evidence is discoverable under Crim.R. 16 has no bearing on its [admissibility]," since such

evidence could be relevant, and all relevant evidence is generally admissible. *Chinn*, Montgomery App. No. 11835, unreported, at 73. The court of appeals found that the question defense counsel propounded "did not concern a police report, but a prior statement of the witness to a police officer," and that "Ward's statements to Officer McKeever concerning 'Tony' were certainly relevant to his identification of Appellant." *Id*. Therefore, the court of appeals determined, "To the extent that [Ward's statements to McKeever] might contradict Ward's trial testimony they were proper grounds for impeachment." *Id*. Additionally, the court of appeals stated, "Appellant was prohibited by Evid.R. 613(B) from introducing evidence of the inconsistent statement in extrinsic form, that is, by way of McKeever's testimony or his written report, unless Ward was first afforded an opportunity to explain and deny the same. The trial court's ruling foreclosed that opportunity. The error was prejudicial if the prior statement could reasonably cause the jury to reject Ward's testimony." *Id*. at 73-74. However, on the issue of prejudice, the court of appeals determined that "the error was not so prejudicial as to require reversal." *Id*. at 74.

{¶ 76} Upon a review of the record, we find that the error, if any, in the trial court's decision not to permit defense counsel to cross-examine Ward on the alleged prior inconsistent statement did not unfairly prejudice appellant. After the trial court had sustained the objection to the question propounded by defense counsel, the defense questioned Ward whether he had ever "talked to McKeever about the description of the man on the passenger's side" of Jones's automobile. Ward responded, "I don't remember at all." Later, during the cross-examination of Major McKeever, defense counsel was permitted to question McKeever concerning the statements that Ward had allegedly made on February 5, 1989:

"Q. Now, you also did some investigation in this case; did you not?

"A. Yes, sir.

"Q. And before you interviewed Marvin Washington, did you not interview a person by the name of Christopher Ward?

"A. Yes, sir. I did.

"Q. In fact, you interviewed him first; is that correct?

"A. That's correct.

"Q. On the same day, the 5th of February?

"A. I can't recall the day. I probably would have to see my report.

" * * *

"Q. This starts at page 12, which was provided to us. Is that your statement?

"A. Yes, that's mine.

"Q. All right.

"A. That was on the same day.

"Q. And was Mr. Ward able to give you a description of the person that he said he saw, the other person, not Marvin Washington?

"A. Very — he indicated to me that he — well, he did see the driver.

"Q. Right.

"A. And shook hands with him, but he was more interested in the car they were driving, the dashboard.

"Q. Didn't he indicate to you that he didn't pay any attention to the other person?

"A. Yes, sir, meaning that he spoke to the gentleman but he was more interested in the dashboard of that particular automobile.

"Q. More interested in the dashboard and didn't pay any attention to the other person?

"A. Correct."

{¶ 77} During redirect examination, the prosecutor questioned McKeever concerning the police report. The prosecution asked McKeever, "I'm going to ask you, they [the defense] asked you about the statement and what Christopher Ward

told you. They asked you this on cross-examination, about the second person, the passenger, this Tony in the car, and I believe Mr. Monta asked about paying attention to him. Was that your conclusion or is it his words?" McKeever responded, "That was my conclusion." The prosecution also asked, "Did Mr. Ward tell you at all times that he could identify the passenger in that car?" McKeever responded, "Several times." The prosecution then asked, "Did he also tell you that he saw the passenger and shook hands, in fact, with the passenger in the victim's car along with Marvin Washington?" McKeever replied, "That's correct."

**{¶ 78}** The record is clear that defense counsel had an opportunity to impeach Ward's trial testimony during cross-examination of McKeever by questioning McKeever concerning Ward's alleged prior inconsistent statement that he "didn't pay any attention" to the man who was with Washington in the victim's car. The record is equally clear that Ward never made any such statement to McKeever. Rather, the statement at issue was McKeever's own statement and was the product of McKeever's own conclusions. In actuality, Ward specifically told McKeever that he had seen "Tony" and that he could positively identify him. Ward did positively identify appellant, and he did so on three separate occasions, *i.e.*, once from a photo array, once at the lineup, and again at trial. Therefore, the alleged inconsistent statement, even if Ward had made it, was not inconsistent with any of Ward's trial testimony. We think it obvious that the trial court's decision not to allow defense counsel to cross-examine Ward concerning the statement had no prejudicial impact whatsoever. The error, if any, was harmless beyond a reasonable doubt.

**{¶ 79}** In this proposition, appellant also claims that the trial court abused its discretion when it refused to admit into evidence the composite sketch of the murder suspect during defense counsel's cross-examination of Marvin Washington and Shirley Cox. Defense counsel requested that the exhibit be admitted into evidence at that time so that the composite sketch could be shown to the jury during

the cross-examination of these two witnesses. However, R.C. 2945.03 provides that "[t]he judge of the trial court shall control all proceedings during a criminal trial, and shall limit the introduction of evidence and the argument of counsel to relevant and material matters with a view to expeditious and effective ascertainment of the truth regarding the matters in issue." Here, the trial court admitted the composite sketch into evidence at the close of the state's case-in-chief and the jury considered it in deliberations. The trial court's decision not to admit the exhibit at an earlier time does not constitute an abuse of discretion.

{¶ 80} Accordingly, appellant's thirteenth proposition of law is not persuasive.

## XV

### Proposition of Law No. XIV

{¶ 81} In his fourteenth proposition of law, appellant contends that the trial court gave unnecessary instructions to the jury in the guilt phase on the law of aiding and abetting and on the subject of prior calculation and design. Appellant argues that the jury was instructed that "he could be found guilty as an accomplice to capital murder," and that "he could be death eligible on the two felony murder specifications as either the principal offender, or if not the principal offender, by prior calculation and design." We reject appellant's arguments for two reasons. First, appellant's arguments have been waived. Second, on the merits, appellant has failed to demonstrate plain error.

{¶ 82} With respect to the trial court's instruction to the jury on the law of accomplice liability, we find that the record does not support appellant's contentions. The prosecution never wavered from its theory that appellant was the principal offender in the aggravated murder of Jones and, more importantly, neither the state nor appellant proffered any evidence suggesting that someone other than appellant was the principal offender. The jury obviously did not find appellant guilty of the aggravated murder of Jones on the theory of accomplice liability, since

the evidence at trial clearly demonstrated that appellant was the principal offender in the aggravated murder. Moreover, having reviewed the trial court's instructions as a whole, we find that the trial court did not specifically instruct the jury on accomplice liability in connection with the aggravated murder charge. Furthermore, contrary to appellant's assertion, this instruction was not unwarranted, since the evidence tended to show that appellant, while the principal offender in the aggravated robbery of Welborn, was an aider and abetter in the aggravated robbery of Jones. Accordingly, we find no plain error with respect to the trial court's instruction to the jury on aiding and abetting.

{¶ 83} As to appellant's arguments concerning the R.C. 2929.04(A)(7) specifications, we also find no error, plain or otherwise. It is not error for a trial court to "instruct the jury on prior calculation and design and principal offender status disjunctively in the same specification, as the court did here." *Burke*, 73 Ohio St.3d at 405, 653 N.E.2d at 248. Appellant does argue, however, that the trial court should have instructed the jury on the need to be unanimous concerning which of the two alternatives (principal offender or prior calculation and design) was applicable. However, appellant never specifically requested such an instruction. Additionally, given the evidence at trial, which showed either that appellant was the principal offender in the aggravated murder or that he had committed no offense at all, it is clear to us that the jury unanimously determined that appellant was the principal offender in the aggravated murder of Jones. See, also, our discussion in Part II, *supra*. Therefore, the lack of instruction on the need for unanimity does not rise to the level of plain error.

XVI

Proposition of Law No. XV

{¶ 84} In his fifteenth proposition of law, appellant questions other aspects of the trial court's guilt phase jury instructions. However, we have reviewed the jury instructions as a whole and find appellant's objections not persuasive.

## XVII

### Proposition of Law No. XVI

{¶ 85} The trial court did not abuse its discretion by failing to give the requested "*Telfaire* instruction" concerning identification testimony. See *United States v. Telfaire* (C.A.D.C.1972), 469 F.2d 552, 558-559. The use of such an instruction is a matter committed to the sound discretion of the trial court. *State v. Guster* (1981), 66 Ohio St.2d 266, 272, 20 O.O.3d 249, 252-253, 421 N.E.2d 157, 161. Here, the trial court gave a modified version of the *Telfaire* instruction that, in our judgment, was more than adequate on the facts of this case.

## XVIII

### Propositions of Law Nos. XVII, XIX, XX, and XXV

{¶ 86} Appellant acknowledges that these propositions of law (Nos. XVII, XIX, XX, and XXV) raise issues that we have previously addressed and rejected in a number of our prior cases. Therefore, appellant concedes that these four propositions of law may be summarily rejected on authority of *State v. Poindexter* (1988), 36 Ohio St.3d 1, 520 N.E.2d 568, syllabus, assuming that our position on the issues has not changed. Our position on these issues has not changed. Therefore, we summarily reject these four propositions of law.

## XIX

### Proposition of Law No. XVIII

{¶ 87} The arguments raised in appellant's eighteenth proposition of law are not supported by a fair and impartial review of the record. Nothing in the trial court's penalty phase instructions or in its response to the jury's questions supports appellant's assertion that "[t]hese instructions, when taken as whole, created a 'reasonable likelihood' that Davel Chinn's jury was precluded from considering all of his nonstatutory [*i.e.*, R.C. 2929.04(B)(7)] mitigation in violation of the Eighth and Fourteenth Amendments."

## XX

Proposition of Law No. XXI

**{¶ 88}** Appellant's twenty-first proposition of law concerns alleged victim-impact evidence that was heard by the trial judge after the jury was discharged but immediately before the trial court pronounced sentence on all of the crimes appellant was found guilty of committing. Appellant claims that the evidence included an expression of opinion by Brian Jones's mother that appellant should be sentenced to death. However, Mrs. Jones never specifically stated her opinion as to the appropriate punishment. Rather, she stated that "now we feel that the time has come for [appellant] to be punished according to the law of Ohio." Appellant also complains that Mrs. Jones stated or implied that appellant was incapable of rehabilitation. However, the record does not fully support appellant's claims in this regard. Moreover, and in any event, there is absolutely nothing in the record to suggest that the trial court was influenced by irrelevant factors in sentencing appellant for the capital crime. Therefore, we find no reversible error here.

XXI

Proposition of Law No. XXII

{¶ 89} In his twenty-second proposition of law, appellant argues that he was deprived of the effective assistance of counsel during the trial court proceedings. Several of appellant's arguments under this proposition of law have been waived. Nevertheless, we have considered all instances of alleged ineffectiveness of trial counsel. We find that appellant has failed to satisfy his burden of establishing ineffective assistance under the standards set forth in *Strickland v. Washington* (1984), 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674.

XXII

Proposition of Law No. XXIII

{¶ 90} Appellant contends that the cumulative effect of errors at the trial court level deprived him of a fair trial and a reliable sentencing determination. We reject appellant's contention in this regard. Appellant received a fair trial and a fair and reliable sentencing determination.

XXIII

Proposition of Law No. XXIV

{¶ 91} Appellant also argues that he was deprived of the effective assistance of counsel in the court of appeals. We find no merit to appellant's contentions. The fact that appellate counsel was able to persuade the court of appeals to reverse the death sentence on two separate occasions over the course of the years is a testament to the effectiveness of appellant's counsel. None of the instances of alleged ineffective assistance of appellate counsel compels reversal here.

XXIV

{¶ 92} Having considered appellant's propositions of law, we must now independently review the death sentence for appropriateness (also raised in appellant's Proposition of Law No. II) and proportionality (also raised in appellant's Proposition of Law No. III). We find that all specifications of

aggravating circumstances of which appellant was found guilty (two under R.C. 2929.04[A][7] and one under [A][3]) were proven beyond a reasonable doubt.

{¶ 93} We specifically reject appellant's Proposition of Law No. II, wherein appellant argues that our independent assessment of the evidence should lead us to conclude that the aggravating circumstances were not proved beyond a reasonable doubt. Washington's testimony clearly chronicled the crimes and the conduct in which he and appellant engaged. His testimony was compelling proof of the existence of the R.C. 2929.04(A)(3) specification of the aggravating circumstance that appellant killed Jones to escape detection, apprehension, trial, or punishment for another offense. Appellant told Washington after the murder that he shot Jones "because he didn't have enough money and he could identify * * * us to the police." Washington's trial testimony also fully supported the two R.C. 2929.04(A)(7) specifications of aggravating circumstances. Moreover, Christopher Ward identified appellant as the person named "Tony" he had seen with Washington shortly after the murder. Gary Welborn, the surviving victim of the robbery, identified Washington as one of the two perpetrators. Welborn testified that the armed assailant who was with Washington "said we'd better have at least a hundred dollars between us or he'd kill us both." Shirley Cox identified "Tony Chinn" as the man police were looking for after she saw the composite sketch printed in the newspaper—the composite that was created as a result of Washington's description of the gunman. Both Washington and Ward were able to positively identify appellant in a photo array, at a lineup, and at trial. Although Washington had waited until immediately after the lineup to actually inform police that appellant was in the lineup, his reasons for so doing were understandable and do not detract from his identification of appellant. With respect to appellant's defense, none of the defense witnesses directly contradicted the state's evidence, except for appellant's mother. Overall, the alibi defense was weak and unpersuasive. The evidence in this case compellingly supports a finding of guilt on

each of the three specifications of aggravating circumstances. We are convinced of appellant's guilt beyond a reasonable doubt.

{¶ 94} For purposes of our independent review, however, we will consider only the single (merged) aggravating circumstance that was considered by the trial court on remand from the court of appeals and that was considered by the court of appeals in its own independent review of appellant's death sentence. Thus, we consider the R.C. 2929.04(A)(7) specification of the aggravating circumstance premised on aggravated robbery—*i.e.*, that appellant shot and killed Brian Jones during the course of an aggravated robbery—which is clearly shown on the record before us.

{¶ 95} The nature and circumstances of the offense reveal nothing of any mitigating value. During the penalty phase, appellant presented no evidence regarding the mitigating factors set forth in R.C. 2929.04(B)(1) through (B)(6), and our review of the record reveals that these factors are inapplicable here.

{¶ 96} In mitigation, appellant presented evidence concerning his history, character, and family background. Appellant's father was murdered in 1972. Appellant's grandmother testified that appellant, as a child, was "[v]ery emotionally upset" over his father's death. She also testified that appellant is deeply devoted to his nieces and nephews and to his entire family. Appellant's brother and sister testified that appellant helped them spiritually and that he is close to his family and helpful to family members. Appellant's mother, Anna Lee, testified that appellant was born in 1957. Lee testified that appellant, during childhood, had no disciplinary problems and was a "[v]ery sensitive" and "active child." According to Lee, appellant became even more sensitive following his father's death. During childhood, appellant read from the Bible, believed in God, and was devoted to his family members. Lee testified that appellant had enrolled in Cambridge Technical Institute to better his life through education. Appellant gave an unsworn statement in which he proclaimed that he was innocent. Appellant

stated that he had been involved in sports and certain civic organizations and activities during his childhood. He expressed his belief in God, his devotion to family, and his bitterness over his father's death. Appellant claimed to be "a compassionate and concerned human being." He also indicated that he had enrolled in Cambridge Technical Institute to better himself and that he was proud of his accomplishments in school.

{¶ 97} Upon a review of the evidence in mitigation, we find that the evidence concerning appellant's history, character, and background is entitled to some, but very little, weight in mitigation. Specifically, we find that appellant's support and devotion for his family, his helpfulness to others, and his efforts toward education are entitled to some, but very minimal, weight in mitigation. Appellant's religious beliefs and his bitterness over his father's death are also entitled to little or no weight in mitigation. Appellant's father died more than a decade before appellant committed this senseless and tragic murder of Brian Jones, an innocent victim who offered absolutely no resistance in the aggravated robbery. Further, appellant's belief in God obviously did not dissuade him from robbing and killing. Additionally, appellant's assertions of innocence—a matter pertaining to the issue of "residual doubt"—are entitled to no weight in mitigation. Residual doubt is irrelevant to the issue of whether appellant should be sentenced to death, *State v. McGuire* (1997), 80 Ohio St.3d 390, 686 N.E.2d 1112, syllabus, and we have absolutely no doubt of appellant's guilt.

{¶ 98} Weighing the evidence presented in mitigation against the single R.C. 2929.04(A)(7) aggravating circumstance, we find that the aggravating circumstance outweighs the mitigating factors beyond a reasonable doubt. Indeed, the mitigating factors in this case absolutely pale in significance to the aggravating circumstance considered here.

{¶ 99} As our final task, we have undertaken a comparison of the sentence imposed in this case to those in which we have previously imposed the death

sentence. Appellant's death sentence is neither excessive nor disproportionate in comparison to the penalty imposed in similar cases. See, *e.g.*, *State v. Raglin* (1998), 83 Ohio St.3d 253, 699 N.E.2d 482, which involved far more mitigating evidence than was presented in the case at bar. We reject appellant's Proposition of Law No. III, wherein appellant claims that his case is far different from cases in which we have previously imposed the death penalty for aggravated (felony) murder committed during the course of an aggravated robbery. Appellant's attempts to distinguish his crime from the crimes of others on the basis that he shot his victim only once and did not shoot the victim in the head, neck, chest, or other vital part of the body are completely unavailing. Jones died as a result of the single shot appellant fired into his body during the course of an aggravated robbery. The shot was fired at point-blank range, and appellant specifically intended to cause the death of the victim. He pressed the muzzle of the revolver against the victim's clothing and pulled the trigger, causing the projectile to rip into the upper portion of Jones's arm and into his chest, where the projectile perforated the main pulmonary artery and came to rest near the base of Jones's heart. The single shot fired by appellant was just as effective in ending Jones's life as the shot or shots that have been fired by other death-row inmates whose sentences we have affirmed for having killed their victims during the course of an aggravated robbery. The fact that appellant shot Jones only once does not make appellant's death sentence either excessive or disproportionate in comparison to those cases in which we have previously affirmed the death penalty.

{¶ 100} Accordingly, for all of the foregoing reasons, we affirm the judgment of the court of appeals and uphold the sentence of death.

*Judgment affirmed.*

MOYER, C.J., RESNICK, F.E. SWEENEY, PFEIFER, COOK and LUNDBERG STRATTON, JJ., concur.

APPENDIX

**{¶ 101}** "*Proposition of Law No. I:* When a jury is allowed to consider nonstatutory aggravating circumstances because it receives inadequate guidance through a lack of instruction, or erroneous instruction during the penalty phase, and duplicative aggravating circumstances are not merged, the resulting death sentence is unreliable and cannot stand. U.S. Const. Amend. VIII and XIV.

**{¶ 102}** "*Proposition of Law No. II:* Where the aggravating circumstances are not proved beyond a reasonable doubt, the death penalty in [*sic*] not appropriate.

**{¶ 103}** "*Proposition of Law No. III:* The death sentence in appellant Chinn's case is excessive and disproportionate to sentences imposed in similar cases.

**{¶ 104}** "*Proposition of Law No. IV:* The cumulative effect of prosecutorial misconduct throughout Chinn's trial violated his rights under the Sixth, Eighth and Fourteenth Amendments of the United States Constitution.

**{¶ 105}** "*Proposition of Law No. V:* The accused's rights to a jury trial, to due process, and to a reliable capital sentencing hearing are denied when the trial court fails to define an essential element of an aggravating circumstance, that makes the accused death eligible. U.S. Const. Amend. VI, VIII, XIV.

**{¶ 106}** "*Proposition of Law No. VI:* A trial court abuses its discretion when it allows the introduction of irrelevant and prejudicial evidence and further allows inadmissible hearsay to be introduced in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

**{¶ 107}** "*Proposition of Law No. VII:* A resentencing procedure in a capital case violates due process and infringes the defendant's right against cruel and unusual punishment when, the defendant is resentenced to death without a recommendation by the trial jury that convicted him, and the resentencing court excludes relevant mitigation, and the resentencing court fails either to independently weigh the mitigation and aggravation or state the reasons why the aggravation outweighs the mitigation. U.S. Const. Amend. VIII and XIV.

**{¶ 108}** "*Proposition of Law No. VIII:* Insufficient evidence to sustain a conviction of aggravated murder is presented where the state relies entirely on the testimony of a co-defendant whose testimony is suspect, and reliable, independent evidence rebuts this testimony. U.S. Const. Amend. XIV.

**{¶ 109}** "*Proposition of Law No. IX:* Ohio Revised Code Ann. § 2929.03(D)(1) (Anderson 1996) renders R.C. §§ 2929.04(A) and (B) unconstitutionally vague. U.S. Const. Amend. VIII, XIV.

**{¶ 110}** "*Proposition of Law No. X:* Where a jury, during its deliberations, communicates with the trial court, and the court, out of the presence of the parties, provides erroneous, substantive instructions to the jury, a new trial is warranted. (*Bostic v. Connor* [1988], 37 Ohio St.3d 144 [524 N.E.2d 881], approved and followed.)

**{¶ 111}** "*Proposition of Law No. XI:* A capital defendant's conviction and death sentence must be overturned where he was denied his right to a fair and impartial jury because the trial court unfairly limited his questioning, refused to conduct individual sequestered voir dire, and failed to excuse jurors who could not be fair and impartial. U.S. Const. Amends. VI, VIII, and XIV.

**{¶ 112}** "*Proposition of Law No. XII:* In order for a capital defendant to be assured equal protection and due process of law, the trial court must see that the state complies with all discovery rules and turns over exculpatory material before trial. Where there are indications that the state is not complying with these rules, the prosecutor's file must be sealed for appellate review. U.S. Const. Amend. XIV.

**{¶ 113}** "*Proposition of Law No. XIII:* The accused's rights to due process, to a fair trial, and to confrontation are denied when the trial court denies the accused an opportunity to challenge the identification testimony of the state's witnesses. U.S. Const. Amend. VI and XIV.

**{¶ 114}** "*Proposition of Law No. XIV:* A jury should not be instructed that the defendant may be found guilty as an accomplice to aggravated murder when the

evidence adduced at trial does not reasonably support that instruction. Whenever the jury is charged that a capital defendant may be found guilty as the principal offender, or as an accomplice acting with prior calculation and design, the defendant is entitled to [a] unanimous verdict on one of those alternative theories. U.S. Const. Amend. VI, VIII and XIV.

{¶ 115} "*Proposition of Law No. XV:* A jury instruction that shifts the burden of proof on the *mens rea* element of any offense to the accused, or reduces the state's burden of proof, violates the Due Process Clause. U.S. Const. Amend. XIV.

{¶ 116} "*Proposition of Law No. XVI:* The accused is denied due process and a fair trial when the trial court fails to give a jury instruction that informs the jury of the problems with identification testimony. U.S. Const. Amend. XIV.

{¶ 117} "*Proposition of Law No. XVII:* The accused's right to due process under the Fourteenth Amendment to the United States Constitution is violated when the state is permitted to convict upon a standard of proof below proof beyond a reasonable doubt.

{¶ 118} "*Proposition of Law No. XVIII:* Constitutional error results when the trial court's penalty phase instructions keep the jury from considering nonstatutory mitigating factors. U.S. Const. Amend. VIII, XIV.

{¶ 119} "*Proposition of Law No. XIX:* A capital defendant's right to a reliable and nonarbitrary death sentence under the Eighth and Fourteenth Amendments is violated when the sentencing jury's responsibility for its verdict is attenuated by the trial court's instructions.

{¶ 120} "*Proposition of Law [No.] XX:* A capital defendant's right to reliable sentencing under the Eighth and Fourteenth Amendments to the United States Constitution is violated when the trial court refuses to instruct the jury that it may consider mercy in its penalty phase deliberations.

**{¶ 121}** "*Proposition of Law [No.] XXI:* It is constitutional error for the trial court to consider victim impact evidence in capital sentencin[g] in the form of an opinion by a victim's family member about the defendant's inability to be rehabilitated and about the proper punishment for the defendant. U.S. Const. Amend. VIII and XIV.

**{¶ 122}** "*Proposition of Law [No.] XXII:* The accused's right to the effective assistance of appointed counsel is denied when counsel's errors and omissions undermine confidence in the result of the trial. U.S. Const. Amend. VI and XIV.

**{¶ 123}** "*Proposition of Law No. XXIII:* The defendant is entitled to a new trial when the cumulative effect of trial error renders the conviction unreliable, and when the evidence against the defendant is not overwhelming. U.S. Const. Amend. VIII, XIV.

**{¶ 124}** "*Proposition of Law [No.] XXIV:* The appellant's right to due process under the Fourteenth Amendment to the United States Constitution is violated by the ineffective assistance of counsel in the court of appeals.

**{¶ 125}** "*Proposition of Law [No.] XXV:* Ohio's death penalty laws are unconstitutional. The Fifth, Sixth, Eighth and Fourteenth Amendments to the United States Constitution establish the requirements for a valid death penalty scheme. Ohio Rev.Code Ann. Sections 2903.01, 2929.02, 2929.021, 2929.022, 2929.023, 2929.03, 2929.04 and 2929.05 (Anderson 1996). Ohio's death penalty statute does not meet the prescribed constitutional requirements and is unconstitutional on its face and as applied to appellant Chinn."